TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-05-00533-CV







Clifford Zeifman, Appellant



v.



Sheryl Diane Michels, Appellee








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 97-09369, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING







O P I N I O N



 Clifford Zeifman appeals the trial court's modification order of a divorce decree
giving appellee Sheryl Diane Michels the exclusive right to make decisions concerning their
daughter's education. In two issues, he complains that the trial court abused its discretion in finding
a material and substantial change in circumstances sufficient to warrant a modification and in
determining that the modification was in the best interest of the child. Because the evidence is
legally insufficient to support a modification, we reverse and render.


FACTUAL AND PROCEDURAL BACKGROUND


 Zeifman and Michels were married on January 12, 1992. Two children were born of
their marriage: G.L., a son, on August 13, 1994, and A.A., a daughter, on February 16, 1997. A
divorce decree was signed on August 4, 1998, based upon an "irrevocable mediated settlement
agreement" that was filed with the court and incorporated into the decree. See Tex. Fam. Code Ann.
§ 6.602 (West 2006). In the decree, the parties agreed that its provisions could be modified by a
court of competent jurisdiction.

 The decree named both parents as joint managing conservators. As to the children's
education, the decree included a negotiated agreement:


The Court finds that the parties have agreed and IT IS THEREFORE ORDERED that
the children shall attend the University of Texas Lab School until such a time as the
children are of the age to attend elementary school. The Court finds that the parties
have agreed and IT IS THEREFORE ORDERED that, at that time, the children shall
attend the public school in the following order of priority for elementary school: (1)
Bryker Woods; or (2) Casis; provided, however, that if neither party lives in a
residential area eligible to attend either Bryker Woods or Casis, then the children
shall attend elementary school which the children are eligible to attend, at the highest
rated school, the highest rating being determined by the annual TAAS testing, using
the previous year's rankings, or shall attend another elementary school to which the
parties agree in writing. The Court finds that the parties have agreed and IT IS
THEREFORE ORDERED that for middle school, the children shall attend the
middle school into which the children's elementary school feeds. The Court finds
that the parties have agreed and IT IS THEREFORE ORDERED that for high school,
the children shall attend the high school into which the children's middle school
feeds.



The decree also contained a provision specifying a mechanism if the parties were unable to agree:



The Court finds that the parties have agreed and IT IS THEREFORE ORDERED that
if the parties cannot agree on educational decisions for a child, the parties shall
follow the recommendations of the person that is the child's teacher at the time of the
decision. IT IS ORDERED that, as child support, Clifford Zeifman and Sheryl Diane
Michels Zeifman shall each pay . . . half (½) of the costs referable to the children's
attendance at the University of Texas Lab School.



At the time of the divorce, Michels lived in the house that had been the couple's home prior to the
divorce, which was within the geographical boundaries for enrollment at Bryker Woods elementary
school. Zeifman moved into a house across the street from the school.

 Although the parties intended for their son, G.L., to attend Bryker Woods, they
learned while he was attending kindergarten that he had learning difficulties. They were able to
reach an agreement to move him to a private school that both parents agreed was more suitable to
his special needs.

 A.A. entered the first grade at Bryker Woods. In April 2004, when A.A. was still in
the first grade, Michels applied for her admission to St. Andrew's Episcopal School for the next
school year. She did not notify Zeifman of the application. As part of her application, Michels
included a recommendation from A.A.'s first-grade teacher at Bryker Woods, and A.A. was tested
to determine her academic suitability. On May 3, A.A. was placed on a waiting list for admission
and Michels notified Zeifman of her decision to apply for A.A.'s admission to St. Andrew's. In
June, A.A. was accepted for admission to the school.

 Zeifman objected to the change of schools and insisted that the parties follow the
decree, which provided for A.A. to continue her education at Bryker Woods. Michels consulted with
A.A.'s first-grade teacher at Bryker Woods who had supplied the application recommendation. The
teacher advised Michels she thought "it would be best if [A.A.] stayed at Bryker Woods."

 On July 19, 2004, Michels filed a Petition to Modify Parent-Child Relationship,
asking the court to modify the decree and award her the exclusive right to make educational
decisions regarding A.A. The petition stated that the order to be modified was the Agreed Final
Decree of Divorce that was rendered on August 4, 1998. Michels alleged that (i) the circumstances
of "the children or of one or both of the joint managing conservators have materially and
substantially changed since the rendition of the order such that the provisions of the Agreed Final
Decree of Divorce regarding education are no longer appropriate and in the best interest of the
children who are the subject of this suit," and (ii) A.A. had been accepted for admission to St.
Andrew's which was a "more exceptional educational opportunity than either [her current school]
Bryker Woods or Casis elementary schools."

 After a hearing, the trial court modified the decree to provide that Michels has the
sole right to make educational decisions for their daughter. The trial court determined that the
circumstances of the child had materially and substantially changed since the date of the rendition
of the original divorce decree. Finding only that "A.A. is different, times are different, you're
remarried, life is different," the trial court concluded that these circumstances constituted material
and substantial changes. Turning to the child's best interest, the trial court concluded that it was in
the child's best interest for Michels to have the exclusive responsibility for educational decisions.

 Although Zeifman requested findings of fact and conclusions of law, the trial court
failed to file them.


ANALYSIS


 In two issues on appeal, Zeifman contends that the trial court abused its discretion
in modifying the divorce decree giving Michels the exclusive right to make decisions concerning
A.A.'s education. Specifically, Zeifman complains that the trial court abused its discretion in finding
a material and substantial change in circumstances sufficient to warrant a modification and that the
modification would be in the best interest of the child because the evidence presented at trial was
legally and factually insufficient as to both requirements.


Standard of Review


 We review a trial court's decision to modify conservatorship under an abuse of
discretion standard. Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982); In the Interest of
P.M.B., 2 S.W.3d 618, 622 (Tex. App.--Houston [14th Dist.] 1999, no pet.). The trial court's order
will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion. 
Id. A trial judge is wisely vested with this discretion because she is best able to observe the
witnesses' demeanor and personalities. A trial court abuses its discretion if it acts arbitrarily and
unreasonably or without regard to guiding rules or principles. K-Mart Corp. v. Honeycutt, 24
S.W.3d 357, 360 (Tex. 2000); Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990) (applying
abuse of discretion standard with regard to child support order); Downer v. Aquamarine Operators,
Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). The mere fact that a trial court decided an issue in a
manner differently than an appellate court would under similar circumstances does not establish an
abuse of discretion. An abuse of discretion does not occur as long as some evidence of a substantive
and probative character exists to support the trial court's decision. P.M.B., 2 S.W.3d at 622.

 Under an abuse of discretion standard, legal and factual sufficiency challenges to the
evidence are not independent grounds of error, but are relevant factors in assessing whether the trial
court abused its discretion. In re D.M., 191 S.W.3d 381, 393 (Tex. App.--Austin 2006, pet. denied);
Dunn v. Dunn, 177 S.W.3d 393, 396 (Tex. App.--Houston [1st District] 2005, pet. denied). 
Because we apply an abuse-of-discretion standard to a modification suit, the traditional sufficiency
standards of review overlap the abuse of discretion standard, and appellate courts apply a hybrid
analysis. Echols v. Olivarez, 85 S.W.3d 475, 476 (Tex. App.--Austin 2002, no pet.); In re D.S., 76
S.W.3d 512, 516 (Tex. App.--Houston [14th Dist.] 2002, no pet.).

 Once it has been determined that the abuse-of-discretion standard applies, an
appellate court engages in a two-pronged inquiry: (1) whether the trial court had sufficient
information on which to exercise its discretion; and (2) whether the trial court erred in its application
of discretion. Echols, 85 S.W.3d at 477-78; Lindsey v. Lindsey, 965 S.W.2d 589, 592 (Tex.
App.--El Paso 1998, no pet.). The traditional sufficiency review comes into play with regard to the
first question; however, the inquiry does not end there. Echols, 85 S.W.3d at 478. The appellate
court then proceeds to determine whether, based on the evidence, the trial court made a reasonable
decision, that is, that the court's decision was neither arbitrary nor unreasonable. Id.

 If findings of fact and conclusions of law are properly requested, the trial court's duty
to file findings and conclusions is mandatory, and the failure to respond when all requests have been
properly made is presumed harmful unless the record shows that the complaining party has suffered
no injury. See Tex. R. Civ. P. 296; Tenery v. Tenery, 932 S.W.2d 29, 30 (Tex. 1996); Cherne Indus.,
Inc. v. Magallanes, 763 S.W.2d 768, 772 (Tex. 1989). The court must make findings on each
material issue raised by the pleadings and evidence, but not on evidentiary issues. In re Davis, 30
S.W.3d 609, 614 (Tex. App.--Texarkana 2000, no pet.); Roberts v. Roberts, 999 S.W.2d 424, 434
(Tex. App.--El Paso 1999, no pet.). Because the trial court did not issue any findings of fact or
conclusions of law, all facts necessary to support the trial court's ruling and supported by the
evidence are implied in favor of the trial court's decision. BMC Software Belgium, N.V. v.
Marchand, 83 S.W.3d 789, 794 (Tex. 2002). But when the appellate record includes both the
reporter's record and the clerk's record, as it does here, the implied findings are not conclusive and
may be challenged for legal and factual sufficiency. Vickery v. Commission for Lawyer Discipline,
5 S.W.3d 241, 251 (Tex. App.--Houston [14th Dist.] 1999, pet. denied). We thus turn to the
standard for a challenge to the legal sufficiency of the evidence.

 When an appellant attacks the legal sufficiency of an adverse finding on an issue on
which he did not have the burden of proof, the appellant must demonstrate on appeal that there is
no evidence to support the adverse finding. Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). 
A legal sufficiency challenge may be sustained when (1) the record discloses a complete absence of
evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no
more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. 
Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998). In determining whether
there is legally sufficient evidence to support the finding under review, we examine the record for
evidence and inferences that support the challenged finding, while disregarding all contrary evidence
and inferences. We must consider evidence favorable to the finding if a reasonable factfinder could,
and disregard evidence contrary to the finding unless a reasonable factfinder could not. City of
Keller v. Wilson, 168 S.W.3d 802, 828 (Tex. 2005).

 In determining a factual sufficiency question, we weigh and consider all the evidence
in the record. Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 83 (Tex. 1992). When an
appellant attacks the factual sufficiency of an adverse finding on an issue on which he did not have
the burden of proof, the appellant must demonstrate the finding is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and manifestly unjust. See Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986). When conducting a factual sufficiency review, a court of appeals must not
merely substitute its judgment for that of the trier of fact. Golden Eagle Archery, Inc. v. Jackson,
116 S.W.3d 757, 761 (Tex. 2003).


Modification of Conservatorship Because of Material and Substantial Change


 To support modification of an order regarding conservatorship, a trial court must find
that the modification would be in the best interest of the child and, as it applies to this case, that the
circumstances of the child, a conservator, or other party affected by the order have materially and
substantially changed since the date of the rendition of the order. Tex. Fam. Code Ann. § 156.101(1)
(West Supp. 2005). The party seeking modification has the burden to establish these elements by
a preponderance of the evidence. Agraz v. Carnley, 143 S.W.3d 547, 552 (Tex. App.--Dallas 2004,
no pet.); In re T.D.C., 91 S.W.3d 865, 871 (Tex. App.--Fort Worth 2002, pet. denied); Considine
v. Considine, 726 S.W.2d 253, 255 (Tex. App.--Austin 1987, no writ). The best interest of the child
is always the primary consideration of the court in determining issues of conservatorship. Tex. Fam.
Code Ann. § 153.002 (West 2002).

 In a conservatorship modification action, a threshold inquiry of the trial court is
whether the moving party has met the burden imposed upon him of showing a material and
substantial change; otherwise the trial court must deny the motion to modify. Bates v. Tesar, 81
S.W.3d 411, 427 (Tex. App.--El Paso 2002, no pet.). To prove that a material change in
circumstances has occurred, the petitioner must demonstrate what conditions existed at the time of
the entry of the prior order as compared to the circumstances existing at the time of the hearing on
the motion to modify. Agraz, 143 S.W.3d at 554; Considine, 726 S.W.2d at 255. The petitioner
must show what material changes have occurred in the intervening period. Id.


 (1) The Petition to Modify Parent-Child Relationship


 The only basis asserted in the modification petition to support the requirement of a
material and substantial change was A.A.'s application and admission to St. Andrew's. Having
gained her daughter's admission to St. Andrew's Episcopal School, Michels filed a modification
petition seeking a departure from the negotiated agreement concerning her daughter's education
contained in the agreed divorce degree. Zeifman opposed the modification, seeking to continue their
daughter's education at Bryker Woods, the public school to which the parties had agreed and set
forth in the divorce decree. Although the petition references both children, the parties agree that the
modification at issue and the court's order relate only to A.A.


 (2) The Evidence


 The testimony showed that the dispute that led to the filing of the petition for
modification arose when Michels applied for and obtained A.A.'s admittance to St. Andrew's
Episcopal School. As a Jew raising Jewish children, Zeifman opposed the modification because he
did not want the child to attend a Christian school and she was thriving at the public school the
parties had agreed to in the divorce decree.

 The undisputed evidence showed that A.A. progressed successfully through
kindergarten, first grade and the beginning of second grade at Bryker Woods prior to trial. In April
2004, Zeifman and Michels discussed enrolling A.A. at a private school. Zeifman proposed that
A.A. attend the Austin Jewish Academy, but Michels disagreed and rejected the proposal. Michels
did not believe the academy had "the academic strengths that I would require for her to be there." 
Without notifying Zeifman, Michels contacted and applied to St. Andrew's for admission, had A.A.
tested, and asked A.A.'s current first-grade teacher for a recommendation. After A.A. was placed
on a waiting list on May 3 subject to available openings at the school, Michels notified Zeifman. 
A.A. was accepted for admission on June 28. On June 30, Michels executed the school's enrollment
contract and forwarded a tuition check. She informed the school, "I am working with her father to
get his agreement regarding her attendance. Otherwise her enrollment will be subject to modification
of our divorce decree."

 Zeifman did not agree to enroll A.A. at St. Andrew's, insisting that the parties follow
the agreement to send her to Bryker Woods, the public school to which the parties had agreed, and
at which the parties agreed she was doing well. Zeifman testified,


My daughter is thriving at the community public school across the street from my
home. And I would only agree to enroll her in something that she had a
demonstrable need for, like [G.L.] has a need for a specialized school, or that Sheryl
[Michels] and I agreed was a place that was going to better fit our idea of how we
want to raise our kids.



As long as A.A. was thriving at Bryker Woods, and there was no demonstrable need to send her to
a specialized private school, Zeifman would not agree to send A.A. to a private school other than the
Austin Jewish Academy, a school with the religious affiliation in which the parties agreed A.A. was
being raised.

 To support her petition that a material and substantial change had occurred since the
rendition of the original divorce decree, Michels offered evidence that in the years since the time of
the parties' divorce, A.A. had grown "from an infant to a beautiful, smart, lovely 7-year old girl." 
She urged that A.A.'s academic abilities and opportunities had surpassed the expectations the parents
had at the time of the divorce decree. In support of the modification order, Michels testified,


Q: At the time, did you have any idea that there would be an opportunity for her to
attend St. Andrew's school?


A: No I did not.


 . . . .


Q: What other--now other than the mere passage of physical time, have there been
other changes that have occurred--significant changes that have occurred in
either your life or in Mr. Zeifman's life?


A: I believe there have been significant changes.


Q: And could you tell the Court what those are.


A: In my life or--


Q: Well, let's start with your life.


A: Okay. Well, since the--since September of '97, that's been quite a bit of time,
I think I've grown in a lot of ways. My children have grown up, and I've
certainly learned from them. I've grown as a parent. Hopefully, as a big sister,
as a daughter, as a friend, as a person, as a physician, as all of those things in
these years of life experience. I think I'm happier and hopefully smarter.


Q: How has your daughter changed?


A: She's grown up from an infant to a beautiful, smart, lovely seven-year-old girl. 
She's proved herself to be social, a gymnast, a cheerleader, smart in school. 
Academically, she's very, very bright. She's basically grown up from an infant
to a young child with extraordinary potential.


Q: And has she--at the time that she was 14 months old and you entered into this
agreed divorce decree, did you have any idea for sure how she was going to turn
out?


A: No.


 . . . .


Q: And did you come to a--what about your daughter, did you have idea how smart
she was going to be?


A: No. I had hoped, but I didn't know.


Michels acknowledged that her daughter was doing very well at Bryker Woods.

 Much of the testimony adduced by Michels centered on St. Andrew's reputation as
a high achieving school and the desirability of a child remaining in a single school through high
school as she would be able to do at St. Andrew's. Michels's partner in her medical group testified
that he served on the St. Andrew's board of trustees, that his children attended St. Andrew's, that
the school sets a high academic standard and provides a diverse culture respectful of various
religions, and that he is familiar with A.A. but has not "seen [her] in years, but I know who she is."

 Education consultant Christopher Kocerik testified that he was first contacted by
Michels on July 8, 2004. Michels advised him that "she had identified a school that she thought was
best, and wanted me to concur if--or give my opinion on as to whether or not that was the best
school for her." Michels told Kocerik that a "custody" matter was involved and that he might be
called upon to testify. Kocerik did not investigate other schools or make a recommendation
regarding schools. He testified, "She asked us to look at her daughter's needs, and look at the option
of St. Andrew's." Kocerik concluded that St. Andrew's would be a "good match" and a "good
opportunity" for A.A.

 The lawyer who represented Michels in her divorce also testified on her behalf. She
had observed A.A. since the divorce and testified that "she's grown up, she's become a lot more
articulate and it is striking how bright she is." She also testified to the benefits of private school over
public school. Lucy Nazro, the head of St. Andrew's, testified that, based upon A.A.'s test scores,
she would do well at St. Andrew's. She explained that the school offers continuity through high
school to its students as well as other opportunities not offered by the public schools such as public
service opportunities, foreign languages, and ethics courses. Dr. Nazro testified that she had a
telephone conversation with Zeifman in which they discussed the academics of the school and he
inquired into the religious life of the school, particularly the practice of daily chapel.

 Zeifman testified that he lives across the street from Bryker Woods and has remarried. 
Because he lives so close, he drops by the school once or twice a week and "bump[s] into the
principal fairly often." He testified to his son's learning disability and that he and Michels agreed
to deviate from the agreement to meet their son's special educational needs. Zeifman testified that
A.A.'s academic and social needs were being met at Bryker Woods and that she was thriving there. 
When Michels rejected his suggestion that A.A. attend the Austin Jewish Academy and applied
instead to St. Andrew's without his knowledge or consent, Zeifman insisted upon following the
decree and having A.A. continue her education at Bryker Woods. He testified that the academics
of the schools was never an issue: "You know, we're in a very good public school, and my daughter,
as evidenced by all the results that have been admitted, has been pretty well served by whatever
we're doing."

 Casey Herrin, A.A.'s first-grade teacher testified that she had taught first grade at
Bryker Woods for five years and that A.A. had been in her class. Herrin described A.A. as a "very
pleasant, very bright" "typical first grader." She was among the top students in the class but had not
been accepted for the gifted and talented program. Herrin testified that both parents were involved
and concerned about their daughter's academic progress: "They both did make sure to frequently
check with me to make sure she was progressing as she should be." A.A.'s stepmother was also
involved at the school.

 At Michels's request, Herrin had completed the recommendation form that
accompanied A.A.'s application for admission to St. Andrew's. At the time of its submission, Herrin
learned that Zeifman was not aware that Michels had asked her to fill out the recommendation. She
knew that Michels was interested in sending her daughter to St. Andrew's: "And I felt like,
obviously, this was something that her parents were going to decide, and that it was my obligation
as her former teacher to go ahead and fill this out for her." Over the summer, probably in June,
Michels asked for her assistance in helping the parents decide which school A.A. should attend. 
Herrin testified,


I told her that I'd have to think about it and get back to her. And when I eventually
got back to her, I informed her that I thought it would be best if [she] stayed at Bryker
Woods. . . . I felt like at one point both parents, obviously, agreed that Bryker Woods
was a good school for [her]. And so I thought best just leave it alone. . . . I didn't
feel like there was any strong need that wasn't being met at Bryker Woods.


Herrin testified that she told Michels that "I thought it would be best if A.A. stayed at Bryker
Woods." They had no further conversations. In response to cross examination, Herrin testified that
Zeifman expressed concerns to her that he thought Bryker Woods was a good school for his daughter
and he had some concerns that St. Andrew's was a religiously affiliated school.

 A Bryker Woods counselor and the principal also testified to the suitability of the
school for A.A.'s needs and its standing in the academic community. The counselor testified that
A.A.'s needs were "absolutely" met at the school and that her current second grade teacher was "one
of the most highly professional teachers I've ever worked with." The principal testified that the
school is a "wonderful little school" that is unique because it is a school of choice for half of its 378
enrolled students. The school was generally rated "exemplary" in its academic ranking by the Texas
Educational Association but had dropped to "recognized" in the 2003/2004 year. He attributed the
change to the addition of the science portion of the test. All of the other test scores had been in the
exemplary range over the cut-off score of ninety percent. He testified that the school is a well-regarded school with extensive parental involvement and small class sizes. He knows most of the
students by name and is familiar with A.A. He testified that she "seems like a great child" who gets
along well with other students. He testified,


I feel that [she] is doing a fine job, you know, in second grade. I think that she has
a wonderful classroom teacher, very caring classroom teacher, and a very
experienced teacher. That's the other good thing that I will like to share also about
Bryker Woods is we have very little teacher turnover. The teachers who have been
there have been there for many, many years. . . . [I]t's a wonderful environment. It's
a small school . . . a great place.


At the conclusion of the trial, the trial judge told the parties that she was "puzzled to have such an
issue brought before this Court" and that she had "struggled listening to the testimony" that "veered
off course in some ways" from the issues, stating,


I became extremely frustrated with the concept that I'm supposed to decide that St.
Andrew's is better than the AISD school system for your child. Even if I accept that
St. Andrew's is a premier school and better than AISD, is that really the issue?
Because it really isn't about whether Harvard is better than UT. It really is about
where the child will actually flourish. And I'm not sure I understand or know that
answer. And I struggled all last evening with what my role was today. Am I
supposed to tell you your child will be more successful at St. Andrew's, or your child
will be more successful in the AISD School District.


Legal Sufficiency of the Evidence

 The issue is whether the trial court's determination that there was a material and
substantial change in circumstances was an abuse of discretion. Based on the evidence, we conclude
that it was.

 A court's determination as to whether a material and substantial change of
circumstances has occurred is not guided by rigid rules and is fact specific. In re Z.B.P., 109 S.W.3d
772, 779 (Tex. App.--Fort Worth 2003, no pet.). Evidence of a parent's subsequent marriage to
another can constitute a relevant, material change of circumstances after rendition of the decree
sought to be modified. In re C.Q.T.M., 25 S.W.3d 730, 735 (Tex. App.--Waco 2000, pet. denied). 
Likewise, change in the age of a child may constitute a material change. In re Davis, 30 S.W.3d 609,
615 (Tex. App.--Texarkana 2000, no pet.); see also Horne v. Hardwell, 533 S.W.2d 450, 452 (Tex.
Civ. App.--Austin 1976, writ ref'd n.r.e.). Increase in age alone is not a changed circumstance to
justify modification unless changed needs are shown. E.g., Voros v. Turnage, 856 S.W.2d 759, 762
(Tex. App.--Houston [1st Dist.] 1993, writ denied); Randle v. Randle, 700 S.W.2d 314, 316-17
(Tex. App.--Houston [1st Dist.] 1985, no writ).

 In any event, the cases finding a material change based on a change in the age of a
child are distinguishable from this case. None of the cases in which a court found the change in the
age of a child to support a modification included a negotiated agreement that specifically
contemplated the change and provided a dispute resolution mechanism as in this case. To allow
aging alone to constitute a material and substantial change in the face of the agreement would render
both the agreement and the language of the statute meaningless.

 Although courts have allowed changes to be proved in a variety of ways, they have
consistently required that a change be proved and that it be shown to be substantial and material. 
See, e.g., Agraz, 143 S.W.3d at 554 (evidence that father not participating in raising children
insufficient to show prior conditions or material change); London v. London, 94 S.W.3d 139, 144
(Tex. App.--Houston [14th Dist.] 2002, no pet.) (court compared financial circumstances of the
affected parties at time of original order with circumstances at time modification sought finding
changed circumstances); Echols, 85 S.W.3d at 479 (court found changed circumstances included
aging of child, remarriages and additional children in both families); Considine, 726 S.W.2d at 255
(re-marriage by one party and relocation to Canada held insufficient). In Considine, this Court stated
that "to prove that a material change of circumstances has occurred, the movant must demonstrate
what conditions existed at the time of the entry of the prior order. Once such conditions have been
established, the movant must show what material changes have occurred in the intervening period." 
726 S.W.2d at 255. (1)
 In that case, we concluded that a parent's remarriage and change of residence
to Canada did not constitute a material and substantial change as to support the modification of
conservatorship. Id.

 Zeifman contends that there was no showing that the circumstances with respect to
A.A.'s education have materially and substantially changed. We agree.

 A.A. was an infant when the parties divorced and in second grade when the case was
tried in October 2004. The change alleged in the petition was her application and admission to St.
Andrew's. At trial, in response to specific questioning as to the change in circumstances, Michels
testified only that the change was that A.A. had grown from an infant into a "beautiful, smart,
lovely" seven-year-old and that her academic ability had surpassed Michels's expectations at the
time of the divorce. At the time of the divorce, the parties entered into a negotiated agreement that
their children would attend certain schools. They further agreed that if they were unable to agree on
educational decisions, they would follow the recommendations of the teacher of the child at issue. 
Thus, the agreement contemplated that the child would age, specified the schools agreed upon and
even the alternatives, and provided a mechanism for dispute resolution should a disagreement arise. 
When a disagreement arose in the instance of their son's special educational needs, the parties
resolved the change pursuant to the terms of the agreement.

 The evidence showed that after the parties divorced they continued to raise A.A. in
the Jewish faith and they continue to adhere to that faith. A.A. attends religious school at
Congregation Agudas Achim and pursues other activities and camps sponsored by the Jewish
Community Center. The parties agree she is being raised Jewish and is part of the Jewish
community, as she has been since she was born. The modification sought specifically to allow
Michels to send A.A. to St. Andrew's would mark a significant change in the child's secular and
religious education. That Zeifman objected to A.A. attending a religious private school based upon
a different faith is consistent with the parties' intent to specify these educational decisions in their
agreement to anticipate and avoid such conflicts.

 The evidence showed that A.A. is a bright and academically talented girl who is
thriving at Bryker Woods, a school located across the street from her father's home. The undisputed
evidence also showed that she did very well academically and socially at Bryker Woods, and that her
academic and social needs were being met. The only evidence that she might do better at St.
Andrew's or that it might be more "suitable" is speculative and, in any event, not sufficient to
constitute a material and substantial change.

 We do not agree that this evidence shows a change in circumstances as contemplated
by section 156.101. See Tex. Fam. Code Ann. § 156.101. To accept Michels's interpretation of the
requirement of a "material and substantial" change would render its language meaningless if age
alone were sufficient in light of the parties' prior agreement. Although there may be a variety of
methods of showing material and substantial change, the requirement is that a change must be
shown. We conclude Michels's evidence is no evidence of a change in conditions. Even assuming
that the St. Andrew's application and admission or A.A.'s change of age constituted changes not
contemplated by the agreement, there was no evidence that either change was material or substantial.

 Moreover, as in all suits regarding the conservatorship of a child, the court's primary
consideration "shall always be the best interest of the child." Tex. Fam. Code Ann. § 153.002; In
re V.L.K., 24 S.W.3d 338, 342 (Tex. 2000). A court may use the nonexhaustive list of Holley factors
to determine the child's best interest. Holley v. Adams, 554 S.W.2d 367, 371-71 (Tex. 1976). Those
factors include the desires of the child, the emotional and physical needs of the child now and in the
future, the emotional and physical danger to the child now and in the future, the parental abilities of
the individuals seeking custody, the programs available to assist these individuals to promote the best
interest of the child, the plans for the child, the stability of the home, the acts or omissions of the
parent, which may indicate that the existing parent-child relationship is not a proper one, and any
excuse for the acts or omissions of the parent. Id. at 371-72. In the context of custody modification,
other factors to be considered include the child's need for stability and the need to prevent constant
litigation in child-custody cases. V.L.K., 24 S.W.3d at 343.

 The policy behind the requirement of a material and substantial change is to prevent
constant relitigation with respect to children. In re M.N.G., 113 S.W.3d 27, 33 (Tex. App.--Fort
Worth 2003, no pet.); Watts v. Watts, 563 S.W.2d 314, 316 (Tex. Civ. App.--Dallas 1978, writ ref'd
n.r.e.) (requirement of material and substantial change predicated upon doctrine of res judicata as
to best interest of child at time of original decree awarding conservatorship). When establishing the
means to modify custody orders, the legislature established a system that attempts to create stability
in the conservatorship. See Burkhart v. Burkhart, 960 S.W.2d 321, 323 (Tex. App.--Houston [1st
Dist.] 1997, pet. denied). Thus, the party seeking modification bears the burden of demonstrating
a material and substantial change in circumstances since the original decree. Bates, 81 S.W.3d at
423. The requirement of this showing "serves a valid purpose of significantly limiting the trial
judge's discretion and prevents the modification statute from being unconstitutionally broad." 
M.N.G., 113 S.W.3d at 34.

 Although the trial court heard contradictory testimony about events that had occurred
between the parties, the undisputed evidence established that A.A. was thriving at Bryker Woods
under the educational plan agreed to in the divorce decree. Much of the testimony focused on the
relative academic standing of the two schools as well as the advantages of a private school over a
public school. Michels acknowledged that A.A. was doing very well at Bryker Woods and that she
would not be harmed by staying at Bryker Woods. A.A.'s teacher, who provided the
recommendation for her admission to St. Andrew's, testified that she believed that it would be in
A.A.'s best interest to stay at Bryker Woods. There was no expert testimony or other evidence that
the change in schools would be in A.A.'s best interest. Because A.A. was making good grades and
thriving at Bryker Woods, and there was no evidence to show that it was in her best interest to
change schools, a review of the record does not establish that the evidence is sufficient to support
the trial court's findings.

 At the time of their divorce, the parties chose to send their children to public schools
unless they agreed otherwise. They also correctly anticipated that they might disagree about
educational decisions concerning the children in the future and included an agreed mechanism in the
decree for resolving any such disagreements.

 We would be remiss if we did not observe that, with the passage of the Texas
Alternative Dispute Resolution Act, it became public policy to "encourage the peaceable resolution
of disputes, with special consideration given to disputes involving the parent-child relationship,
including the mediation of issues involving conservatorship, possession, and support of children, and
the early settlement of pending litigation through voluntary settlement procedures." Tex. Civ. Prac.
& Rem. Code Ann. § 154.002 (West 2005). It would undermine the efforts of mediated settlement
agreements for us to allow a modification on circumstances that were clearly contemplated by the
parties at the time of the rendition of the original divorce decree. We also observe, however, that
the existence of a mediated settlement agreement does not alter the requirements of section 156.101;
we hold only that, on the record before us, the petitioner failed to carry her burden of demonstrating
a material and substantial change of circumstances and that the modification would be in the best
interest of the child. See Tex. Fam. Code Ann. § 156.101. (2)


CONCLUSION


 We conclude that the evidence is legally insufficient to support the trial court's
finding that the circumstances of the child, as specifically alleged in the petition, or of either
conservator have materially and substantially changed. We hold that, based on the record before us,
the trial court abused its discretion in ordering modification. We sustain appellant's challenge to the
legal sufficiency of the modification. We reverse the trial court's order to modify and render
judgment in favor of Zeifman.



 __________________________________________

 Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton: Opinion by Justice Patterson;

 Concurring Opinion by Justice Pemberton

Reversed and Rendered

Filed: August 4, 2006

1. For the trial court to determine if a material and substantial change has occurred, most
courts require a comparison between the original circumstances of the child and the affected parties
at the time the existing order was entered with their circumstances at the time the modification is
sought. E.g., London v. London, 94 S.W.3d 139, 144 (Tex. App.--Houston [14th Dist.] 2002, no
pet.). Thus, the record must contain both historical and current evidence of the relevant
circumstances. Without both sets of data, the court has nothing to compare and cannot determine
whether a change has occurred. Id. at 144-45.

2. Because of our disposition of the legal sufficiency issue, we need not address the remaining
issues regarding factual sufficiency.